In the Matter of MARY I. DANIMAN et al., Petitioners, against BOARD OF EDUCATION OF THE CITY OF NEW YORK, Respondent.

In the Matter of VERA SHLAKMAN et al., Petitioners, against BOARD OF HIGHER EDUCATION OF THE CITY OF NEW YORK, Respondent.

Supreme Court, Special Term, Kings County, December 5, 1952.

*Witt & Cammer* for petitioners.

*Denis M. Hurley, Corporation Counsel (Michael A. Castaldi of counsel), for respondents.*

F. E. JOHNSON, J. In these two proceedings under article 78 of the Civil Practice Act, some of the petitioners were dismissed by the board of higher education and the others by the board of education of the city of New York, but the grounds upon which all the dismissals took place are so similar that the proceedings have been heard together, and should be decided together.

There is very little, if any, dispute of fact, and the differences of opinion are almost altogether on the law; they arise partly because of the difference of view as to the status that these teachers had in relation to the City of New York. Generally speaking, the petitioners deny that they had such a relationship or status as made applicable to them section 903 of the City Charter, under which the respondents here claimed power to act. They decided that the section was self-operating, and that the refusal of these petitioners to answer the questions asked them effectuated their dismissals, at least in substance, by reason of the language of that section.

One or more duly designated members of the Senate of the United States held a hearing on the general subject of subversive influences; each of these petitioners appeared upon demand and all were confronted with various questions (which are not relevant here) in addition to the one or two questions that are relevant, namely, their relation to the Communist party or to communism. The phrasing of the questions on these subjects is not criticized, nor can there be any doubt about their meaning; there is no suggestion that the slightest confusion did, or could, exist among any of the petitioners as to what they were being asked, or the meaning of the questions. In substance, the whole issue or problem here arises out of the questions concerning the present or past membership of these petitioners in the Communist party. There were other similar, or related, questions that need not be detailed.

The world events that have been common knowledge for years past require this court to take judicial notice that the party — which is really the group of fourteen men who, by armed might, hold the disarmed Russians in their grasp — is not only preaching the destruction of non-communist governments, but by espionage, sabotage, oppression and murder are, and have been, busily and successfully undermining the freedom of other dis-

armed nations that are now in a state of hopeless captivity to that small group. Their agent, the New York Communist Party, is continuously following the program here; their success among certain Americans, who have sold out their own government, is too well known to be further dwelt upon.

The 1949 Legislature declared the *policy of the State* (L. 1949, ch. 360, § 1) as to Communist party members, as teachers, when it said: "The legislature further finds and declares that in order to protect the children in our state from such subversive influence it is essential that the laws prohibiting persons who are members of subversive groups, such as the communist party and its affiliated organizations, from obtaining or retaining employment in the public schools, be rigorously enforced."

Mr. Marshall, while a board of education member, said in 1951: "The evidence before us is clear that Communist Party members have a loyalty to Soviet Russia and to the promotion of world Communism which is a higher loyalty than loyalty to their own country; that class hatred and the destruction of the bourgeois state are part of Communist doctrine; that the seizure of power in the interest of creating a so-called dictatorship of the proletariat is implicit in Communist Party membership; and that Party members engaged in education have the special task of using education for these purposes. The record shows this."

In his concurring opinion in the 1951 *Dennis* case (*Dennis* v. *United States,* 341 U. S. 494, 564) Justice JACKSON, of the Supreme Court of the United States, said: "The Communist Party, nevertheless, does not seek its strength primarily in numbers. Its aim is a relatively small party whose strength is in selected, dedicated, indoctrinated, and rigidly disciplined members. From established policy it tolerates no deviation and no debate. It seeks members that are, or may be, secreted in strategic posts in transportation, communications, industry, government, and especially in labor unions where it can compel employers to accept and retain its members. It also seeks to infiltrate and control organizations of professional and other groups. Through these placements in positions of power it seeks a leverage over society that will make up in power of coercion what it lacks in power of persuasion."

Our Court of Appeals has said that it is slanderous to call anyone a communist because of the low repute in which that so-called ideology is held; it is not yet a *crime* to call anyone a communist. There have been many impressive adjudications,

too well known to be cited here, that the Communist party is, and has been, committed to the program of changing all other governments by force, and that in this country a part of its program is the destruction, by force, of the government under which we live; nowhere, however, is it claimed or has it been claimed that *membership* in the Communist party is a *crime*.

Petitioners did not, however, merely refuse to answer since that might have been contumacious, so they all gave the lawyer-like answer that undoubtedly was formulated for them by the counsel who either represented them, or most of them, on various occasions and who, as was not contradicted upon the argument hereof, gave active legal help in the formulation of some of their oral answers.

Those answers, in substance, were similar in that they all said that they would not say yes or no because the answer might tend to *incriminate* them; most of them specified the particular amendment of the Federal Constitution relied upon but, in substance, they said they would not reply lest they *incriminate* themselves. Their answers, as the minutes show, were that they were in danger of self-incrimination if they answered; they refused to admit anything, refused to make any answer that, as some said, might be used against them; in effect, and almost in form, refused to testify, as some said, against themselves.

It is not claimed here that any particular answer given by any one of them had any other meaning than the foregoing; the issue was met squarely, upon the argument here by their counsel, who did not seek in any way to evade the plain significance of what they were saying, but who took the position that they could not be *required* to answer such questions.

That argument is a combination of (1) a plea of the Federal Amendment and (2) a denial that the question was allowably asked because of the alleged inapplicability of the questions to these petitioners, since they claimed to be not within section 903.

After an exhaustive argument upon these petitions the court was not able to learn what *crime* it was that they feared to expose themselves to prosecution for or what possible plausibility there was to the claim that answering might *incriminate* them.

That vain attempt to learn, upon the argument hereof, how it could reasonably or with intellectual honesty, be said that one who was asked that question could sensibly say that answering it might *incriminate* him, leaves the question still unanswered.

It is a fair inference, if there is any need to draw one, that they appeared before the committee well aware of why they were there, and all prepared to give a similar answer when each was asked that main question; there is also no reasonable doubt about what did happen on those hearings, namely, that they were asked in straight-forward language that very question and no one of them would answer.

It may not be important to now consider the fact that the reason given to the Senate committee was not intellectually honest because there is no such thing as a *criminal consequence* to their giving the answer; or that the entire plea was an '' escape-method '' based upon the completely fallacious suggestion that saying '' yes '' to the question would *incriminate* them. If, therefore, as it seems now, the question called for an answer that *could not possibly incriminate* them, and to plead the amendment was merely a subterfuge since it was completely inapplicable, this situation may have some relation to the conduct of the respondents. Article 78 brings up in this court of limited jurisdiction the question of the dismissals having been *arbitrary and capricious*. (*Matter of Humphrey* v. *State Ins. Fund,* 298 N. Y. 327.) Article 78 is like the writ of certiorari, and the review that is provided recognizes that the body or officer so reviewed has made a decision '' which involves an exercise of judgment or discretion.'' (Civ. Prac. Act, § 1284, subd. 2.) It brings up whether the respondents, if exercising even quasi-judicial functions, have acted in *excess* of jurisdiction (but had jurisdiction of the subject-matter) and whether their authority has been used in the manner required by law, or has been so used as to violate the rights of the petitioners to their prejudice and whether any competent proof of the facts existed, etc.

The apparently complete inapplicability of this plea of non-incrimination seems relevant on the question of the natural and proper reaction of the respondent officers to the specious reason thus given to the Senate committee; also because, as a matter of mere common sense, it throws upon these teachers of the youth of the city the seemingly well-founded implication or accusation that their attitude at that inquiry was not intellectually honest; that they successfully evaded the question on the unsound plea that they were in danger of *criminal* proceedings if they answered, although it is obvious that they could not be in the slightest danger of any proceedings of a *criminal* nature.

The inquiry of the Senate committee was not irrelevant to the duties of the petitioners who had a special position towards the youth of the city; it is undeniable that children of school age are much more susceptible than adults to wrong suggestions, and if these petitioners had any notions that the average citizen considers wrong, the danger that might exist of their more or less deliberately poisoning the minds of the children would be very real. If the Communist party *is* the enemy of this form of government, and *is* dedicated to its destruction, and they *are* or *were* members of it, it is common sense to believe that they too must be deemed to be committed to that destruction. If they were members, and sincere in their membership in a party committed to the destruction of our Constitution, it is ironical, when they are asked about that, to plead that very Constitution. The fact is that they were, by indirection, accused by the question of being *themselves* now, or in the past, committed to the overthrow of both the Constitution and the government based upon it. That charge they would not admit or deny; they evaded it by this intellectually false plea of supposed right to protection against imaginary *criminal* prosecution; under that smoke-screen they were allowed to escape a direct answer.

Where does that leave them, from the standpoint of any intelligent parent whose child is to be enclosed in a classroom with them day by day? There are opportunities for, apparently, casual remarks and destructive comments, which are not only unlimited, but cannot be disproven or undone. If they belonged to a society for the establishment of robbery and murder (and, therefore, presumably themselves committed to a policy of theft and death) no sane person would want them to even approach his child. The destruction of this government will require wholesale bloodshed, so it seems amazing that any American citizen would be willing to join a party committed to its destruction, yet when asked a question based upon the (incredible) tacit assumption that they, by reason of such suggested membership, would seem to be committed to such wholesale bloodshedding and destruction, what kind of people are they who will not answer? They apparently insist on holding on to the *opportunity* to influence those who are too young to withstand the poison that might be dropped into their minds.

Therefore, when the question was asked each of them, their jobs were threatened; they had a dilemma facing them; if they admitted membership the special *duty* that they had towards

the young, and the special *opportunities* they had with the young, and their practically unsupervised *contact* with children, would undoubtedly cause an uprising among parents, and certainly perhaps cost them their jobs. They dared not answer " Yes." But, since there was no public registration of them, if they *were* members, and no place where they were obliged to *swear* that they were members, how easily could they, if they really were members, have falsely and safely answered in the negative? That easy escape from the dilemma would be (if they *were* members) to *falsely* say they were *not* members, *thereby shutting the mouths of those who implied (but could not prove) they were members.*

They did not take that escape position; they were under oath before the committee; if they *falsely* said they were *not* members (when in fact they knew they were members) they might *possibly* be prosecuted for *perjury* if the party record was at hand.

What did they do, facing this dilemma? Their thought can have been: " If I *lie* about the *proper* answer to that question I will be guilty of perjury; I ought not to be asked *to tell a falsehood* which might render me subject to that *criminal* prosecution; therefore I plead the 5th Amendment."

They were *not asked to tell a falsehood,* presumably were asked only for the *truth,* and there is nothing in these papers, or on the argument, which suggests that they *thought* they were being asked to *lie* about the answer. If they were members, a truthful answer could not possibly do them any *criminal* law harm, although it might have cost them their jobs. If they were not, then, or ever, members, why not say so?

Is there, therefore, any possible understanding of their position except that (1) if they answered *truthfully* that they were members, they would lose their jobs; if they answered *falsely,* they might face prosecution for perjury? If that were the choice that faced them, the plea of the statute was not intellectually honest; their plea was founded upon the false *assumption* that they were being asked to falsify the answer and to say falsely that they were *not* members, whereupon, because of the *falsehood* under oath, they might be liable to perjury prosecution.

However, the entire purpose of the amendment, and the only sensible meaning of it, is that no one shall be compelled to *tell the truth about himself* if it will do him criminal harm or be used against him *criminally.* That it may degrade him (as petitioners failed to claim) is not raised here. The only ground given was that they refused to *incriminate* themselves by telling the *truth* — when there could be no *crime* in so doing.

The respondents, upon the foregoing situation, surely were not guilty of arbitrary or capricious conduct when they decided that these petitioners were either intellectually dishonest, or were, in fact, members of the party and so committed to everything that would be involved in a party attempt to destroy by force the government existing here, and the Constitution upon which it is based.

Section 903 governs employees of both respondent bodies, not only because of the dual nature of each, but because there have been judicial decisions that so hold, in principle. Education is not, as claimed, said by the Federal Constitution to be solely a *State* function; nothing in Articles IX or X warrants that claim. The Legislature, acting under subdivision B of section 13 of Article IX of the New York Constitution has ample power to delegate the local operation of a school system to boards, like the respondents, that will have dual aspects and be both city and State agencies. No proof is given here that the city does not spend part of its own taxes for school buildings, etc.; it is also common knowledge that the members of both boards are appointed by the Mayor. The title of each board indicates it is part of the city government, at least to a degree.

When the officials of these boards, whose duty it is to safeguard the children from being debauched mentally and morally, find that their teachers are putting on this false show of indignation over being exposed as apparent enemies of the nation, and are falsely claiming to be immune to questions that go to the roots of their honesty and loyalty, and that when questioned they will not say yes or no to whether they belong to a group generally regarded as godless, disloyal, destructive and dishonest, are they arbitrary and capricious in dismissing them? Indeed, would not their retention of petitioners be grossly arbitrary and childishly capricious? Is not the cleansing of the city's school system of such foulness and danger one of the " affairs of the city " mentioned in section 903, which the respondent boards are in duty bound to attend to?. The section makes the refusal to answer immediately effective, vacating the position each holds as soon as he or she has refused; they cannot (despite the dishonesty of their plea of the amendment) be compelled to answer, but the Legislature provided that *refusal* at once costs each his or her position. These respondents merely had to later carry out the formalities; the Legislature made the petitioners their own executioners.

The petitions are dismissed.