# SLOCHOWER *v.* BOARD OF HIGHER EDUCATION OF NEW YORK CITY.

No. 23.  Argued October 18–19, 1955.—Decided April 9, 1956.

*Ephraim London* argued the cause and filed a brief for appellant.

*Daniel T. Scannell* argued the cause for appellee. With him on the brief were *Peter Campbell Brown, Seymour B. Quel* and *Helen R. Cassidy.*

*Osmond K. Fraenkel* and *Emanuel Redfield* filed a brief for the New York Civil Liberties Union, as *amicus curiae*, urging reversal.

MR. JUSTICE CLARK delivered the opinion of the Court.

This appeal brings into question the constitutionality of § 903 of the Charter of the City of New York. That section provides that whenever an employee of the City utilizes the privilege against self-incrimination to avoid answering a question relating to his official conduct, "his term or tenure of office or employment shall terminate and such office or employment shall be vacant, and he shall not be eligible to election or appointment to any office or employment under the city or any agency." [1] Appellant Slochower invoked the privilege against self-incrimination

---

[1] The full text of § 903 provides:

"If any councilman or other officer or employee of the city shall, after lawful notice or process, wilfully refuse or fail to appear before any court or judge, any legislative committee, or any officer, board or body authorized to conduct any hearing or inquiry, or having appeared shall refuse to testify or to answer any question regarding the property, government or affairs of the city or of any county included within its territorial limits, or regarding the nomination, election, appointment or official conduct of any officer or employee of the city or of any such county, on the ground that his answer would tend to incriminate him, or shall refuse to waive immunity from prosecution on account of any such matter in relation to which he may be asked to testify upon any such hearing or inquiry, his term or tenure of office or employment shall terminate and such office or employment shall be vacant, and he shall not be eligible to election or appointment to any office or employment under the city or any agency."

under the Fifth Amendment before an investigating committee of the United States Senate, and was summarily discharged from his position as associate professor at Brooklyn College, an institution maintained by the City of New York. He now claims that the charter provision, as applied to him, violates both the Due Process and Privileges and Immunities Clauses of the Fourteenth Amendment.

On September 24, 1952, the Internal Security Subcommittee of the Committee on the Judiciary of the United States Senate held open hearings in New York City. The investigation, conducted on a national scale, related to subversive influences in the American educational system. At the beginning of the hearings the Chairman stated that education was primarily a state and local function, and therefore the inquiry would be limited to "considerations affecting national security, which are directly within the purview and authority of the subcommittee." Hearings Before the Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws of Senate Committee on the Judiciary, 82d Cong., 2d Sess. 1. Professor Slochower, when called to testify, stated that he was not a member of the Communist Party, and indicated complete willingness to answer all questions about his associations or political beliefs since 1941. But he refused to answer questions concerning his membership during 1940 and 1941 on the ground that his answers might tend to incriminate him. The Chairman of the Senate Subcommittee accepted Slochower's claim as a valid assertion of an admitted constitutional right.

It had been alleged that Slochower was a Communist in 1941 in the testimony of one Bernard Grebanier before the Rapp-Coudert Committee of the New York Legislature. See *Report of the Subcommittee of the Joint Legislative Committee to Investigate Procedures and Methods of*

*Allocating State Moneys for Public School Purposes and Subversive Activities,* Legislative Document (1942), No. 49, State of New York, at 318. Slochower testified that he had appeared twice before the Rapp-Coudert Committee, and had subsequently testified before the Board of Faculty relating to this charge. He also testified that he had answered questions at these hearings relating to his Communist affiliations in 1940 and 1941.

Shortly after testifying before the Internal Security Subcommittee, Slochower was notified that he was suspended from his position at the College; three days later his position was declared vacant "pursuant to the provisions of Section 903 of the New York City Charter." [*]

Slochower had 27 years' experience as a college teacher and was entitled to tenure under state law. McKinney's New York Laws, Education Law, § 6206 (2). Under this statute, appellant may be discharged only for cause, and after notice, hearing, and appeal. § 6206 (10). The Court of Appeals of New York, however, has authoritatively interpreted § 903 to mean that "the assertion of the privilege against self incrimination is equivalent to a resignation." *Daniman* v. *Board of Education,* 306 N. Y. 532, 538, 119 N. E. 2d 373, 377. Dismissal under this provision is therefore automatic and there is no right to charges, notice, hearing, or opportunity to explain.

The Supreme Court of New York, County of Kings, concluded that appellant's behavior fell within the scope of § 903, and upheld its application here. 202 Misc. 915, 118 N. Y. S. 2d 487. The Appellate Division, 282 App. Div. 718, 122 N. Y. S. 2d 286, reported *sub nom. Shlakman* v. *Board,* and the Court of Appeals, reported

---

*[Reporter's Note: A sentence which was reported in the Preliminary Print at p. 554, lines 13–18, was deleted by an order of the Court entered May 28, 1956, 351 U. S. 944.]

*sub nom. Daniman* v. *Board, supra,* each by a divided court, affirmed. We noted probable jurisdiction, 348 U. S. 935, because of the importance of the question presented.[2]

Slochower argues that § 903 abridges a privilege or immunity of a citizen of the United States since it in effect imposes a penalty on the exercise of a federally guaranteed right in a federal proceeding. It also violates due process, he argues, because the mere claim of privilege under the Fifth Amendment does not provide a reasonable basis for the State to terminate his employment. Appellee insists that no question of "privileges or immunities" was raised or passed on below, and therefore directs its argument solely to the proposition that § 903 does not operate in an arbitrary or capricious manner. We do not decide whether a claim under the "privileges or immunities" clause was considered below, since we conclude the summary dismissal of appellant in the circumstances of this case violates due process of law.

The problem of balancing the State's interest in the loyalty of those in its service with the traditional safeguards of individual rights is a continuing one. To state that a person does not have a constitutional right to government employment is only to say that he must comply with reasonable, lawful, and nondiscriminatory terms laid down by the proper authorities. *Adler* v. *Board of Education,* 342 U. S. 485, upheld the New York Feinberg Law which authorized the public school authorities to

---

[2] Thirteen other individuals brought suit for reinstatement after their dismissal for pleading the privilege against self-incrimination in the same federal investigation. We dismissed the appeal of these individuals "for want of a properly presented federal question." *Daniman* v. *Board,* 348 U. S. 933. See *Daniman* v. *Board,* 307 N. Y. 806, 121 N. E. 2d 629, where the New York Court of Appeals declined to amend its remittitur to state that a federal question had been presented and passed on as to these appellants, but did so amend its remittitur as to Slochower.

dismiss employees who, after notice and hearing, were found to advocate the overthrow of the Government by unlawful means, or who were unable to explain satisfactorily membership in certain organizations found to have that aim.[3]   Likewise *Garner* v. *Los Angeles Board,* 341 U. S. 716, 720, upheld the right of the city to inquire of its employees as to "matters that may prove relevant to their fitness and suitability for the public service," including their membership, past and present, in the Communist Party or the Communist Political Association.   There it was held that the city had power to discharge employees who refused to file an affidavit disclosing such information to the school authorities.[4]

But in each of these cases it was emphasized that the State must conform to the requirements of due process. In *Wieman* v. *Updegraff,* 344 U. S. 183, we struck down a so-called "loyalty oath" because it based employability solely on the fact of membership in certain organizations. We pointed out that membership itself may be innocent and held that the classification of innocent and guilty together was arbitrary.[5]   This case rests squarely on the proposition that "constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory."   344 U. S., at 192.

Here the Board, in support of its position, contends that only two possible inferences flow from appellant's claim

---

[3] MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS dissented.   MR. JUSTICE FRANKFURTER dissented on grounds of standing and ripeness.

[4] MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS dissented.   MR. JUSTICE FRANKFURTER and MR. JUSTICE BURTON concurred in this aspect of the case, but dissented from other portions of the decision in separate opinions.

[5] MR. JUSTICE BLACK and MR. JUSTICE FRANKFURTER concurred in separate opinions in which MR. JUSTICE DOUGLAS joined.   MR. JUSTICE BURTON concurred in the result.

of self-incrimination: (1) that the answering of the question would tend to prove him guilty of a crime in some way connected with his official conduct; or (2) that in order to avoid answering the question he falsely invoked the privilege by stating that the answer would tend to incriminate him, and thus committed perjury. Either inference, it insists, is sufficient to justify the termination of his employment. The Court of Appeals, however, accepted the Committee's determination that the privilege had been properly invoked and it further held that no inference of Communist Party membership could be drawn from such a refusal to testify. It found the statute to impose merely a condition on public employment and affirmed the summary action taken in the case. With this conclusion we cannot agree.

At the outset we must condemn the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment. The right of an accused person to refuse to testify, which had been in England merely a rule of evidence, was so important to our forefathers that they raised it to the dignity of a constitutional enactment, and it has been recognized as "one of the most valuable prerogatives of the citizen." *Brown* v. *Walker,* 161 U. S. 591, 610. We have reaffirmed our faith in this principle recently in *Quinn* v. *United States,* 349 U. S. 155. In *Ullmann* v. *United States,* 350 U. S. 422, decided last month, we scored the assumption that those who claim this privilege are either criminals or perjurers. The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury. As we pointed out in *Ullmann,* a witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing. The privilege serves to protect the innocent who otherwise might

be ensnared by ambiguous circumstances. See Griswold, The Fifth Amendment Today (1955).

With this in mind, we consider the application of § 903. As interpreted and applied by the state courts, it operates to discharge every city employee who invokes the Fifth Amendment. In practical effect the questions asked are taken as confessed and made the basis of the discharge. No consideration is given to such factors as the subject matter of the questions, remoteness of the period to which they are directed, or justification for exercise of the privilege. It matters not whether the plea resulted from mistake, inadvertence or legal advice conscientiously given, whether wisely or unwisely. The heavy hand of the statute falls alike on all who exercise their constitutional privilege, the full enjoyment of which every person is entitled to receive. Such action falls squarely within the prohibition of *Wieman* v. *Updegraff, supra.*

It is one thing for the city authorities themselves to inquire into Slochower's fitness, but quite another for his discharge to be based entirely on events occurring before a federal committee whose inquiry was announced as not directed at "the property, affairs, or government of the city, or . . . official conduct of city employees." In this respect the present case differs materially from *Garner,* where the city was attempting to elicit information necessary to determine the qualifications of its employees. Here, the Board had possessed the pertinent information for 12 years, and the questions which Professor Slochower refused to answer were admittedly asked for a purpose wholly unrelated to his college functions. On such a record the Board cannot claim that its action was part of a bona fide attempt to gain needed and relevant information.

Without attacking Professor Slochower's qualification for his position in any manner, and apparently with full knowledge of the testimony he had given some 12 years

before at the state committee hearing, the Board seized upon his claim of privilege before the federal committee and converted it through the use of § 903 into a conclusive presumption of guilt. Since no inference of guilt was possible from the claim before the federal committee, the discharge falls of its own° weight as wholly without support. There has not been the "protection of the individual against arbitrary action" which Mr. Justice Cardozo characterized as the very essence of due process. *Ohio Bell Telephone Co.* v. *Commission,* 301 U. S. 292, 302.

This is not to say that Slochower has a constitutional right to be an associate professor of German at Brooklyn College. The State has broad powers in the selection and discharge of its employees, and it may be that proper inquiry would show Slochower's continued employment to be inconsistent with a real interest of the State. But there has been no such inquiry here. We hold that the summary dismissal of appellant violates due process of law.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Justice Black and Mr. Justice Douglas join the Court's judgment and opinion, but also adhere to the views expressed in their dissents in *Adler* v. *Board of Education,* and *Garner* v. *Los Angeles Board, supra,* and to their concurrences in *Wieman* v. *Updegraff, supra.*

Mr. Justice Reed, with whom Mr. Justice Burton and Mr. Justice Minton join, dissenting.

In reliance upon the Due Process Clause of our Constitution, the Court strikes deep into the authority of New York to protect its local governmental institutions from influences of officials whose conduct does not meet

the declared state standards for employment. This New York City Charter, § 903, adopted in 1936, to take effect in 1938, was designed to eliminate from public employment individuals who refused to answer legally authorized inquiries as to the "official conduct of any officer or employee of the city . . . on the ground that his answer would tend to incriminate him." Its provisions, as applicable to Professor Slochower and others, have been upheld by the Court of Appeals of New York under multi-pronged state grounds of attack in the instances where he and other city teachers of New York have sought to bar their removal from their positions.[1]

The sole reliance of the Court for reversal of the New York Court of Appeals is that § 903, as here applied, violates the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. The Court of Appeals amended its remittitur to show that it held federal due process was not violated. 307 N. Y. 806, 121 N. E. 2d 629. In view of the conclusions of the Court of Appeals we need deal only with that problem. The Court of Appeals has exclusive power to determine the reach of its own statute.

---

[1] *Matter of Daniman* v. *Board of Education, Matter of Shlakman* v. *Board of Higher Education,* 306 N. Y. 532, 119 N. E. 2d 373.

"In this court we are all agreed that the Communist party is a continuing conspiracy against our Government. . . . We are also all in agreement that an inquiry into past or present membership in the Communist party is an inquiry regarding the official conduct of an officer or employee of the City of New York. Loyalty to our Government goes to the very heart of official conduct in service rendered in all branches of Government. . . . Communism is opposed to such loyalty. . . . Internal security affects local as well as National Governments." *Id.,* at 540–541, 119 N. E. 2d, at 379. The majority decided § 903 was applicable to a "hearing before a Federal legislative committee" and that this appellant was an employee of the city. *Id.,* at 541, 119 N. E. 2d, at 379.

The Court finds it a denial of due process to discharge an employee merely because he relied upon the Fifth Amendment plea of self-incrimination to avoid answering questions which he would be otherwise required to answer. We assert the contrary—the city does have reasonable ground to require its employees either to give evidence regarding facts of official conduct within their knowledge or to give up the positions they hold. Petitioners never contended that error or inadvertence led them to refuse to answer. Their contention is set out in the margin below.[2] Discharges under § 903 do not depend upon any conclusion as to the guilt of the employee of some crime that might be disclosed by his testimony or as to his guilt of perjury, if really there was no prosecution to fear. We disagree with the Court's assumption that § 903 as a practical matter takes the questions asked as confessed. Cities, like other employers, may reasonably conclude that a refusal to furnish appropriate information is enough to justify discharge. Legally authorized bodies have a right to demand that citizens furnish facts pertinent to official inquiries. The duty to respond may be refused for personal protection against prosecution only, but such avoidance of public duty to furnish information can prop-

---

[2] Appellant's petition to the Supreme Court of the State of New York stated in pertinent part as follows:

"9. Petitioners answered some and refused to answer others of the questions referred to in paragraph 8 on various and numerous grounds, including the ground that the Subcommittee had not jurisdiction to inquire into such matters, the ground that the First Amendment to the Constitution of the United States forbade such inquiry, the ground that the procedures of the Subcommittee violated their rights under the Fifth Amendment to the Constitution of the United States and that they could not be required under the Fifth Amendment to answer such questions, and on other grounds. The Subcommittee acquiesced in the refusal of petitioners to answer such questions."

erly be considered to stamp the employee as a person unfit to hold certain official positions. Such a conclusion is reinforced when the claimant for protection has the role of instructor to youth. The fact that the witness has a right to plead the privilege against self-incrimination protects him against prosecution but not against the loss of his job.[3]

The Court may intend merely to hold that since the facts of Slochower's alleged Communist affiliations prior to 1941 were known to the Board before the federal claim, and since the inquiries of the Committee were asked for a purpose unrelated to his college functions, therefore it was a denial of due process to vacate his office. If so, its conclusion is likewise, we think, erroneous. We agree that this case is not like *Garner* v. *Los Angeles Board,* 341 U. S. 716, an attempt to elicit information about professional qualifications. But § 903 is directed at the propriety of employing a man who refuses to give needed information to appropriate public bodies.

Consideration of the meaning of "due process" under the Fourteenth Amendment supports our position that § 903 of the City Charter does not violate that concept. For this Court to hold that state action in the field of its unchallenged powers violates the due process of the Federal Constitution requires far more than mere disagreement with the legal conclusions of state courts. To require, as the Court does, that New York stay its hand in discharging a teacher whom the city deems unworthy to occupy a chair in its Brooklyn College, demands that this Court say, if it follows our prior cases, that the action of the Board in declaring Professor Slochower's position

---

[3] Cf. *Ullmann* v. *United States,* 350 U. S. 422, at 438–439:
"For the history of the privilege establishes not only that it is not to be interpreted literally, but also that its sole concern is, as its name indicates, with the danger to a witness forced to give testimony leading to the infliction of 'penalties affixed to the criminal acts . . . .' "

vacant was inconsistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.[4]  A denial of due process is "a practice repugnant to the conscience of mankind." [5] Surely no such situation exists here.

Those charged with educational duties in a State bear heavy responsibilities.  Only a few years ago, in *Adler* v. *Board of Education,* 342 U. S. 485, we upheld against three dissents the Feinberg Law of New York making ineligible for employment as a teacher in any public school a member of any subversive organization, if he knew its purpose.  The argument that the "fact found bears no relation to the fact presumed," *i. e.,* "disqualification for employment," was rejected.  There also the contention was denial of due process.  We said:

> "A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live.  In this, the state has a vital concern.  It must preserve the integrity of the schools.  That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted.  One's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty." *Id.,* at 493.

A great American university has declared that members of its faculty who invoked the Fifth Amendment before committees of Congress were guilty of "misconduct"

---

[4] *Hebert* v. *Louisiana,* 272 U. S. 312, 316.  Cf. *Twining* v. *New Jersey,* 211 U. S. 78, 100.

[5] *Palko* v. *Connecticut,* 302 U. S. 319, 323, 325, 326.  Cf. *Francis* v. *Resweber,* 329 U. S. 459, 463; *Adamson* v. *California,* 332 U. S. 46, 53.

though not grave enough to justify dismissal.[6] Numerous other colleges and universities have treated the plea of the Fifth Amendment as a justification for dismissal of faculty members.[7] When educational institutions themselves feel the impropriety of reserving full disclosure of facts from duly authorized official investigations, can we properly say a city cannot protect itself against such conduct by its teachers?

The New York rule is not the patently arbitrary and discriminatory statute of *Wieman* v. *Updegraff*, 344 U. S. 183. There "[a] state servant may have joined a proscribed organization unaware of its activities and purposes." P. 190. This Court unanimously condemned as arbitrary the requirement of an oath that covered both innocent and knowing membership without distinction. A different situation exists here. Section 903 was included

---

[6] 42 American Association of University Professors Bulletin 96. Compare The Rights and Responsibilities of Universities and their Faculties, Association of American Universities, March 24, 1953, III:

"As in all acts of association, the professor accepts conventions which become morally binding. 'Above all, he owes his colleagues in the university complete candor and perfect integrity, precluding any kind of clandestine or conspiratorial activities. He owes equal candor to the public. If he is called upon to answer for his convictions it is his duty as a citizen to speak out. It is even more definitely his duty as a professor. Refusal to do so, on whatever legal grounds, cannot fail to reflect upon a profession that claims for itself the fullest freedom to speak and the maximum protection of that freedom available in our society. In this respect, invocation of the Fifth Amendment places upon a professor a heavy burden of proof of his fitness to hold a teaching position and lays upon his university an obligation to reexamine his qualifications for membership in its society.

.      .      .      .      .

". . . When the powers of legislative inquiry are abused, the remedy does not lie in noncooperation or defiance; it is to be sought through the normal channels of informed public opinion."

[7] 42 American Assn. of University Professors Bulletin 61–94.

in the Seabury Report to help in the elimination of graft and corruption.[8]  Numerous employees had refused to testify as to criminal acts on the ground of self-incrimination.  New York decided it did not want that kind of public employees.  We think New York had that right. We would affirm the judgment of the Court of Appeals.

MR. JUSTICE HARLAN, dissenting.

I dissent because I think the Court has misconceived the nature of § 903 as construed and applied by the New York Court of Appeals, and has unduly circumscribed the power of the State to ensure the qualifications of its teachers.

As I understand MR. JUSTICE CLARK's opinion, the Court regards § 903 as raising some sort of presumption of guilt from Dr. Slochower's claim of privilege.  That is not the way the Court of Appeals construed the statute. On the contrary, that Court said: "we do not presume, of course, that these petitioners [one of whom was Dr. Slochower] by their action have shown cause to be discharged under the Feinberg Law (L. 1949, ch. 360) since no inference of membership in the Communist party may be drawn from the assertion of one's privilege against self incrimination."[1]  Since § 903 is inoperative if even incriminating answers are given, it is apparent that it is the exercise of the privilege itself which is the basis for the discharge, quite apart from any inference of guilt. Thus the Court of Appeals could say that "The assertion of the privilege against self incrimination is equivalent to a resignation."[2]  It is also clear that the Board of Education's discharge of Dr. Slochower was on this same

---

[8] In the Matter of the Investigation of the Departments of the Government of the City of New York, Final Report by Samuel Seabury, December 27, 1932, pp. 9–10.

[1] 306 N. Y. 532, 538, 119 N. E. 2d 373, 377.

[2] *Ibid.*

premise. The question this case presents, therefore, is not whether any inferences can constitutionally be drawn from a claim of privilege, but whether a State violates due process when it makes a claim of privilege grounds for discharge.

In effect, what New York has done is to say that it will not employ teachers who refuse to cooperate with public authorities when asked questions relating to official conduct. Does such a statute bear a reasonable relation to New York's interest in ensuring the qualifications of its teachers? The majority seems to decide that it does not. This Court has already held, however, that a State may properly make knowing membership in an organization dedicated to the overthrow of the Government by force a ground for disqualification from public school teaching. *Adler* v. *Board of Education*, 342 U. S. 485. A requirement that public school teachers shall furnish information as to their past or present membership in the Communist Party is a relevant step in the implementation of such a state policy, and a teacher may be discharged for refusing to comply with that requirement. *Garner* v. *Los Angeles Board*, 341 U. S. 716. Moreover, I think that a State may justifiably consider that teachers who refuse to answer questions concerning their official conduct are no longer qualified for public school teaching, on the ground that their refusal to answer jeopardizes the confidence that the public should have in its school system. On either view of the statute, I think Dr. Slochower's discharge did not violate due process.

It makes no difference that the question which Dr. Slochower refused to answer was put to him by a federal rather than a state body. The authority of the subcommittee to ask the question is not controverted. While as an original matter I would be doubtful whether § 903 was intended to apply to federal investigations, the

Court of Appeals has ruled otherwise, and its interpretation is binding on us. Dr. Slochower cannot discriminate between forums in deciding whether or not to answer a proper and relevant question, if the State requires him to answer before every lawfully constituted body. Here, the information sought to be elicited from Dr. Slochower could have been considered by state authorities in reviewing Dr. Slochower's qualifications, and the effect of his claim of privilege on the public confidence in its school system was at least as great as it would have been had his refusal to answer been before a state legislative committee.

There is some evidence that Dr. Slochower had already answered, before a state committee, the same question which he refused to answer before the congressional subcommittee.[3] Even assuming that New York already had the information, I cannot see how that would prevent New York from constitutionally applying § 903 to this claim of privilege. Apart from other considerations, who can tell whether Dr. Slochower would have answered the question the same way as he had before?

On this record I would affirm the decision of the Court of Appeals. A different question would be presented under the Privileges and Immunities Clause of the Fourteenth Amendment. But that question was not raised below, and is therefore not open here. *Dewey* v. *Des Moines,* 173 U. S. 193.

---

[3] At the Senate subcommittee hearing, in response to Senator Ferguson's inquiry whether or not Dr. Slochower had "ever" answered a question concerning Communist Party membership in 1940 or 1941, Dr. Slochower replied: "Yes, I did answer it."