Ftjld, J.
(dissenting). While I am not unmindful of the public interest to be served by ridding government of the subversive and the security risk, I cannot join in the court’s decision, for, in my view, the appellant’s discharge from his job of subway conductor was effected in disregard of the applicable statute and in violation of constitutional right.
The Security Risk Law was enacted in 1951, as a temporary emergency measure (L. 1951, ch. 233), in response to the Communist aggression in Korea the year before (§ 1). In substance, it authorizes “ Any public officer, board, body or commission of the state or of any civil division thereof ” to discharge or suspend “ any officer or employee under his or its appointive jurisdiction occupying a security position or a position in a security agency, whenever such officer, board, body or commission shall find, after proper investigation and inquiry, that, upon all the evidence, reasonable grounds exist for belief that, because of doubtful trust and reliability, the employment of such person in such position would endanger the security or defense of the *374 nation and the state ” (§ 5).[1] A “ security agency ” is defined as any agency or unit of government where ‘ ‘ functions are performed which are necessary to the security or defense of the nation and the state ” or where “ confidential information relating to the security or defense of the nation and the state may he available.” A “security position” is a post in the public service “ which requires the performance of functions which are necessary to the security or defense of the nation and the state ” or one in any public agency or department ‘ ‘ where confidential information relating to the security or defense of the nation and the state may be available ” (§ 2). To the State Civil Service Commission is delegated the authority of determining whether an agency is a security agency or whether a job is a security position within the meaning of the statute (§3).
It is open to grave doubt that the New York City Transit Authority, set up as a “ body corporate and politic constituting a public benefit corporation ” (Public Authorities Law, § 1801, subd. 1), may be regarded as an agency “ of the state or of any civil division thereof ” within the ambit of the act before us (Security Risk Law, § 5). It is likewise dubious that the Transit Authority may correctly be labeled a “ security agency ” within the statute’s definition (§ 2, subd. [a]). However, I put these troublesome doubts to one side, since I am thoroughly persuaded that, in any event, the Security Risk Law may not be stretched, under the circumstances of this case, to reach the appellant whose duties are to open and close the doors of subway trains.
Parlous though the times, the anticipation of risks to “ the security or defense of the nation and the state ” (§5) from a person in the appellant’s position strikes me as a submission to unreasoning fear rather than a rational basis for administrative action. (Cf. Cole v. Young, 351 U. S. 536; Matter of Ping *375 gera v. Municipal Civil Service Comm., 206 Misc. 615.) The job of opening and closing the doors of a subway train is hardly one of the “ strategic posts in transportation” to which Mr. Justice Jackson adverted in Dennis v. United States, 341 U. S. 494, 564 (see opinion of Conway, Ch. J., ante, p. 370). Of course, all men possess a capacity to do injury, but, to pose a risk to security or defense, one’s potential for harm must be greater, more distinctive, than this appellant’s; no less danger or risk is to be anticipated from any one of the millions of persons who periodically ride the subways as passengers.[2]
However, even if the statute were to be held to apply to the appellant, his dismissal cannot be sustained without violating his right to due process of law under both state and federal constitutions (N. Y. Const., art. I, § 6; U. S. Const., 14th Arndt.).[3]
The statute, as noted, requires a finding based “ upon * * * evidence ” that, “ because of doubtful trust and reliability, the employment of [the] person * # * [in question] would endanger the security or defense of the nation and the state ” (§ 5). The only “ evidence ” in support of the Transit Authority’s finding “ of [appellant’s] doubtful trust and reliability ” consisted of his refusal, on the basis of the constitutional privilege against self incrimination, to answer questions put to him by the city commissioner of investigation relating to membership in the Communist party. Apart from his *376 constitutionally protected silence, there was not the slightest evidence or predicate in the record for any inference that he was a member of that organization, that he was of doubtful trust or reliability or that his continued employment would prove dangerous to state or nation.
It is important at the outset to observe that we have here no question whether the state could with propriety, by a clearly worded statute, impose an absolute duty upon public officers or employees to answer questions relating to their official conduct as a condition of continued employment. (See New York City Charter, § 903; N. Y. Const., art. I, § 6; cf. Garner v. Los Angeles Bd., 341 U. S. 716.) The statute before us, essentially different, imposes no such condition. Instead, it authorizes dismissal only upon “ evidence ” that the particular officer or employee is of such “ doubtful trust and reliability ” as to endanger the “ security ” or “ defense ” of the nation and the state. The narrow issue here presented, therefore, is whether the appellant’s exercise of his constitutional right to remain mute may serve as the basis for inferring • the existence of the facts prescribed by the statute as a condition of discharge.
Slochower v. Board of Educ. (350 U. S. 551), though concerned with a different statute and a somewhat different situation, seems to me decisive that such an inference may not be drawn from the mere assertion of the privilege. The Supreme Court there held, and in unmistakable terms announced, that an imputation of guilt from the claim of privilege would constitute ‘ ‘ arbitrary action ’ ’ violative of the ‘ ‘ very essence of due process ” (p. 559).
Firmly established as “ one of the great landmarks in man’s struggle to 'make himself civilized” (Griswold, The Fifth Amendment Today [1955], p. 7, the privilege against self incrimination stands as a bulwark for the protection of persons accused, as well as of witnessés, who, though entirely innocent of any wrongdoing, may have a reasonable and honest fear of prosecution. Becognition of this fundamental right demands that it be freely exercisable without undue restraint or invidious *377 consequences. As the Supreme Court declared in Slochower (350 U. S., at p. 557):
“ At the outset we must condemn the practice of imputing a sinister meaning to the exercise of a person’s constitutional right under the Fifth Amendment. The right of an accused person to refuse to testify, which had been in England merely a rule of evidence, was so important to our forefathers that they raised it to the dignity of a constitutional enactment, and it has been recognized as ‘ one of the most valuable prerogatives of the citizen.’ Brown v. Walker, 161 U. S. 591, 610. We have reaffirmed our faith in this principle recently in Quinn v. United States, 349 U. S. 155. In Ullmann v. United States, 350 U. S. 422, decided last month, we scored the assumption that those who claim this privilege are either criminals or perjurers. The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury.”
It is urged that the Slochower decision is not in point, since the Supreme Court itself there noted that the case involved the assertion of the privilege in an investigation conducted by a “ federal committee ” rather than by “ city authorities ” (p. 558). That observation, however, in no way operated to lessen the force either of the Supreme Court’s sweeping condemnation of “ the practice of imputing a sinister meaning to the exercise of a person’s constitutional right under the Fifth Amendment” or of the court’s solemn affirmation that that right “ would be reduced to a hollow mockery if its exercise ” could be twisted into a confession of guilt or disloyalty.
Yet that is precisely the vice of what was done in this case. It is contended that a public officer or employee, unlike the general citizenry, may properly be found to be at least “ of doubtful trust and reliability,” if not actually disloyal, where he claims his right to refuse to answer questions relating to his possible association with a subversive organization. Whether, however, the refusal be taken as an admission of his membership in such organization or merely as engendering a doubt as to his reliability, the fact remains that in either instance an adverse, “ sinister ” inference, fraught with serious consequences, is attempted to be drawn from the invocation of the constitutional privilege. Based as it was solely upon his exercise *378 of the privilege, the appellant’s discharge constitutes “ arbitrary action” within Slochower, regardless of the formal difference in the labels employed. Any other conclusion would be strange indeed: to treat reliance upon a fundamental constitutional guarantee as proof of “ untrustworthiness and unreliability ” is anomalous, a veritable contradiction in terms.
The point is made that the appellant should have availed himself of the opportunity afforded by the statute of submitting statements or affidavits ‘ ‘ to show why he should be reinstated or restored to duty” (Security Bisk Law, § 5). As I read the record before us, the “ opportunity ” was illusory, a Hobson’s choice. His alternatives were either to repeat his reliance upon the constitution or to forego that right, to reassert his privilege or to capitulate and answer the question. His failure to make the choice is, consequently, irrelevant.
There is ever a need to achieve a balance between government security and the traditional rights of the individual. That balance has been destroyed by the way in which the statute before us has been applied. It is a delusion to think that the nation’s security is advanced by the sacrifice of the individual’s basic liberties. The fears and doubts of the moment may loom large, but we lose more than we gain if we counter with a resort to alien procedures or with a denial of essential constitutional guarantees. “ Historic liberties and privileges,” this court declared some twenty-five years ago (Matter of Doyle, 257 N. Y. 244, 268), “ are not to bend from day to day ‘ because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment ’ (Holmes, J., in Northern Securities Co. v. United States, 193 U. S. 197, 400), are not to change their form and content in response to the ‘ hydraulic pressure ’ (Holmes, J., supra) exerted by great causes.”
I would reverse the orders of the courts below.

. Another provision recites that the finding required by section 5 “may be based upon evidence of the previous conduct of the * * * officer, or employee * * * which may include to the extent deemed appropriate, but shall not be limited to evidence of (a) previous unauthorized disclosure of confidential information; (b) the commission or attempt to commit an act or acts designed to or tending to undermine, sabotage, hamper or obstruct a program adopted by the ageney or department by which he is employed or which affects the security or defense of the nation and the state; (c) treasonable or seditious conduct; and (d) membership in any organization or group found by the state civil service commission to be subversive” (§ 7; emphasis supplied).

. It should, of course, be noted that in appellant’s ease the statute’s careful definition and examples of a “security position” have been entirely ignored. It is argued that they are irrelevant because the State Civil Service Commission has denominated the Authority a “security agency,” thereby converting its every post into a “ security position,” but I find no justification in the statute for such action. (Cf. Cole v. Young, supra, 351 U. S. 536.)
Indeed, the record tells us nothing of the steps taken by the commission in reaching its determination. Moreover, we are left completely in the dark as to whether the appellant or others affected were notified that the matter was under consideration, or even that the determination had been made. (Security Risk Law, §§ 2, 3; cf. Anti-Fascist Comm. v. McGrath, 341 U. S. 123, 165 et seq., per Frankfurter, J., concurring.) We are not even told where the determination of the commission is to be found or whether any opportunity was afforded for the prescribed judicial review (§§ 3, 4; cf. Adler v. Board of Educ., 342 U. S. 485, 490).

. In the view thus taken, I have no occasion to consider the appellant’s further reliance upon the privileges and immunities clause of the Fourteenth Amendment — though I am inclined to agree with the court’s conclusion that that clause is not here applicable. (Cf. Adamson v. California, 332 U. S. 46; Slochower v. Board of Educ., 350 U. S. 551, 555.)