Guy A. Graves, J.
Under the provisions of section 3020-a of the Education Law, the superintendent of schools of respondent Mechanicville Central School District caused two charges to be brought against the petitioner, a tenured teacher of English. Respondent’s board of education voted to find probable cause on both and then undertook to have the State Education Department convene a hearing after which the three-member hearing panel made recommendations. Hearings on two different days were held and on March 31, 1975 the panel recommended as follows:
As to charge No. 1 — insubordination: Two to one vote for dismissal; the panel member voting to sustain charge had no recommendation as to penalty.
As to charge No. 2 — insubordination: Two to one vote to sustain. Of the two majority voters, one had no recommendation for penalty; the other recommended the severest penalty *146 to consist of no more than placement of a letter of administrative reprimand in petitioner’s personnel file.
By decision dated April 30, 1975, the respondent’s board of education voted unanimously to sustain both charges and to terminate petitioner. It is from this decision that petitioner appeals in a CPLR article 78 proceeding alleging broadly that the decision and penalty were wrongful, arbitrary and capricious in that they involved a denial of due process; were not supported or proven by substantial evidence in the record; violated petitioner’s First Amendment constitutional rights; and that even if charges could be sustained, the penalty was out of proportion and thus shocking to the court’s conscience.
The specification in charge No. 1 of insubordination consisted of an allegation that petitioner remained only five minutes in a private conference re his teaching procedures, called by his school principal, left the meeting without the latter’s consent and without just cause, refused to return to the conference and that the disobedience took place in public. The transcript of the panel hearing supports the conclusion that petitioner had words with the principal and left because he claims he was insulted. Whatever interpretation is placed on this exchange of "pleasantries” between mature professional people, several incontestible facts emerge, viz: the relatively objective finding of a majority of the hearing panel was that no insubordination as charged could be determined: the respondent school board, however, upon reviewing the same record and examining the panel’s recommendations unanimously found petitioner guilty of insubordination.
Sincere and learned men may well differ as to the motives and significance of human behavior. Upon examination of all the transcripts, affidavits and exhibits submitted, I am unable to determine which finding is correct. I am equally unable to say, as a matter of law, that the board of education’s vote was arbitrary, unreasonable and not supported by the proof submitted. Whether this finding alone or considered together with charge No. 2 would support the penalty assessed is another matter, to be adverted to later in this decision.
Charge No. 2 of insubordination specifies a more serious infraction said to have been committed by petitioner, viz: that in 1973 a conference involving petitioner, the school principal and the superintendent of schools was held and a discussion carried on relative to use of the novel Catcher in the Rye as part of the school curriculum. Parental protests over the *147 teaching of this publication had been registered with the school administration. Not the publication itself, but rather the "misuse” of it, with particular reference to a certain vocabulary printed therein was stated to be the issue and allegedly all parties to the conference agreed that the book would not be used in the curriculum again and that a substitution would be found and used by petitioner in the conduct of his English course. Despite a letter evidencing this agreement sent by the superintendent to petitioner, the latter, allegedly without the knowledge and consent of the school administration, restored the book in question to the English curriculum, with ensuing and continued parental objections.
Here, again, the school board unanimously found petitioner guilty of the charge. As noted, the panel by a 2 to 1 vote had previously recommended a finding sustaining this charge.
An examination of all the transcripts and other papers submitted leaves little room for doubt that petitioner had been called in for a conference, been advised what the problem was, and had been asked to agree to a certain procedure which he later did not follow: Whatever his private motives and concepts of academic freedom might have been, the evidence tends to support the conclusion that petitioner did not carry out what he knew to be the wishes of the school administration. Testimony that petitioner reintroduced the teaching of Catcher in the Rye after a vote by his pupils or that he never really agreed to limit his curriculum but to look for a substitute, etc., may or may not be a fact but is not sufficient to overcome the conclusion that the board’s decision as to "insubordination” as far as the so-called "agreement” is concerned was based on a record, supported by the reasonably credible evidence supplied by certain fellow employees, although denied by other witnesses.
On the face of it, therefore, and technically I can find no basis or authority on review for substituting the court’s judgment as to the credibility and weight of the evidence over that of the board’s. Indeed, the authority seems to the contrary in this respect. (Matter of Tessier v Board of Educ. of Union Free School Dist. No., Town of Hempstead, 24 AD2d 484, revd on other grounds, 19 NY2d 680; see Matter of Halloran v Kirwan, 28 NY2d 689.)
It is at this point, however, that we must turn our attention to the principal thrusts of petitioner’s case, i.e. that substantive due process was denied; section 3020-a of the Education *148 Law and rules promulgated thereunder are illegal and unconstitutional in view of Kinsella v Board of Educ. (378 F Supp 54); and that petitioner’s First Amendment constitutional rights were violated ab initio.
Petitioner’s contention as to the unconstitutionality of section 3020-a of the Education Law and the regulations thereunder is without merit in the Third Department. Several recent decisions clearly recognize the respective constitutionality and legality thereof. (See Hodgkins v Central School Dist. No. 1, 50 AD 2d 73; Hodgkins v Central School Dist. No. 1, 48 AD2d 302; and also Matter of Bott v Board of Educ., 51 AD2d 81.)
As to due process, it is well established that a tenured teacher has a constitutionally protected interest — even a property interest — in his right to employment and compensation therefor, of which he cannot be deprived without due process, including at least a hearing. (Slochower v Board of Educ., 350 US 551; Kinsella, supra.)
The record indicates the school administration followed a formal procedure throughout the matter. Complaints were considered, petitioner was called in for consultation at various times and given specific warnings, conferences were held or attempted, probable cause for charges was found; a statement of charges and specifications were provided, a hearing panel was requested and did function at which petitioner had the opportunity to present evidence and cross examine, the board received and appeared to give consideration to the panel’s findings and recommendations, which it is required to do although they are not in any way conclusive upon the employing board (see Hodgkins v Board of Educ., 50 AD2d 73, 74), and finally respondent’s decision set forth reasons and a factual basis for its determination as required by the regulations. See Hodgkins (supra) again.
The procedural forms of due process were followed with one major omission: There was no allegation or evidence that the board ever adopted regulations or produced a valid directive for teachers’ guidance concerning the teaching of Catcher in the Rye or similar books suitable for substitution if possible. Before a charge of insubordination could be properly presented and sustained, it would appear the aforesaid action would be essential. See Matter of Bott (supra), in particular, Justice Main’s holding in connection with the specific complaints therein.
An ad hoc "agreement” of this type between the parties *149 involved would not necessarily have general application. Accordingly, even if insubordination or failure to comply in respect to such an "agreement” were to be found, it would not be sufficient as a basis for a charge and a finding thereon, with its possible severe consequences to a tenured teacher.
Finally, a careful examination of the hearing transcripts as noted previously reveals that the proof may support a finding petitioner failed to follow the so-called "agreement” not to use "Catcher” but it fails to uphold the findings by substantial testimony of any witness including students who actually observed petitioner’s behavior or methods in class.
In short, the board’s procedural due process was defective to the extent that the result amounted to a deprivation of substantive düe process.
All this is not to deny the power and responsibility of the school administration under the by-laws of the board of education to, inter alia, prepare the contents of each course of study, to recommend suitable lists of textbooks and to generally supervise and direct the teachers in the system. (Education Law, § 2508.) The avoidance of obscenity and pornography in teaching is certainly a proper concern of the school system, as are the problems of maintaining discipline among teachers and pupils while preserving responsible academic freedom.
However, as stated by the United States Supreme Court in Keyishian v Board of Regents (385 US 589, 603), "That [academic] freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom”. The "chilling” effect on "academic freedom” of school board decisions which rest on well-meaning but general, unstructured, ambiguous charges supported to a considerable extent by second-hand reports and hearsay testimony and rendered in response to "faceless complainants” must be averted.
Thus, even if respondent’s contention that the alleged agreement carries the same force and effect as a direct order were upheld, can petitioner’s claim of deprivation of his constitutional rights particularly under the First Amendment be ignored? More specifically, were his constitutional rights violated by the school administration’s efforts expressed in the so-called agreement to restrict his use of "Catcher” in teaching a high school sophomore English class; or is this claim a bootstrap question or "concocted notion” to overcome the insubordination issue? (See James v Board of Educ. of Cent. *150 School Dist. No. 1 of Towns of Orangetown and Clarkstown, 37 NY 2d 891.)
Balancing the rights and advantages of academic freedom versus some measure of effective control over the contents of a curriculum presents an enormously difficult problem to individual teachers and administrators in modern schools and indeed to the courts, particularly when an obscenity factor is involved. That this was no small concern to respondent is clear from the wording of the specification in charge No. 2: "the issue was not the publication per se, but the alleged misuse of the publication and certain vocabulary printed therein.”
Catcher in the Rye itself might well be regarded as an innocuous narrative of the eminently forgettable adventures of one of our contemporary archetypes — the adolescent anti-hero, the non-achieving but, oddly appealing though misunderstood prep school student misfit with a heart of gold. As English is perceived today, the novel is well written, but as is customary in popular best-sellers, it has a chapter or two dealing with its youthful protagonist’s groping, fumbling "sex life” and, horrible to contemplate, the author indulges several times in a well-known common vulgarity, the use of the "f-k”.
This ancient anglo-saxon four-lettered obscenity is one not unknown outside the classroom to high school students and to their elders, if not juniors. Indeed any corner newstand seems to have a magazine or paperback with such offensive language or worse readily available. It is difficult to fathom how the presence in the school curriculum of a book containing such language could possibly have any serious independent impact on the morals and behavior of the students or the orderly administration of the school system.
Whether it was out of consideration for matters of good taste or because of certain parental pressures, the school administration nevertheless reacted and as the wording of the specification in charge No. 2 indicates, it apparently attempted to solve the problem by, on the one hand, stating it was not the book itself but its misuse, and, on the other, acting to ban the book entirely from the curriculum. It is small wonder, then, that the obvious ambiguity therein might lead to some confusion on the part of teachers and the administration.
*151 Numerous Federal court decisions were cited by petitioner dealing with cases involving public high school teachers facing discipline or discharge because of the content or methods of their teaching, particularly where offensive or obscene language was involved. Keefe v Geanakos (418 F2d 359) is particularly apposite to our instant case, even to the particular vulgarity in question. Without detailing the circumstances which were similar to the present petitioner’s, I reiterate the basic question as to academic freedom posed therein, i.e. "whether a teacher may for demonstrated educational purposes, quote a dirty word currently used in order to give special offense, or whether the shock is too great for high school students to stand.” The Federal court found that the "dirty word”, though repeated a number of times, was not artificially introduced; was important to the development of the thesis and the conclusion of the author; was in general use by people in the same age group as the students; appeared in other school library books and was objected to by parents. To this extent, then, we are faced with the same problem.
In finding for the petitioner on First Amendment grounds, the court stated (p 362): "We accept the conclusion of the court below that 'some measure of public regulation of classroom speech is inherent in every provision of public education.’ But when we consider the facts at bar as we have elaborated them, we find it difficult not to think that its application to the present case demeans any proper concept of education. The general chilling effect of permitting such rigorous censorship is even more serious.”
If such regulation is attempted, careful attention must be given to substantive as well as procedural due process in establishing acceptable teaching guidelines.
Turning now to the petitioner’s final point that penalty was excessive it is clear that dismissal for insubordination sustained in charge No. 1 would be excessive in the light of all the circumstances referred to above. The matter should be returned to the board for further consideration of a penalty provided for by statute short of dismissal. The board’s determination as to charge No. 2 is annulled for the reasons cited above.