Steve **MARTELL, Paxton Landfill Corporation, and Stryker International, Inc., Plaintiffs,**

v.

Michael **MAUZY, Director, Illinois Environmental Protection Agency and The Illinois Environmental Protection Agency, Defendants.**

No. 81 C 0285.

United States District Court,
N. D. Illinois, E. D.

April 17, 1981.

Ann C. Tighe and Robert M. Stephenson, George J. Cotsirilos & Associates, Ltd., Chicago, Ill., for plaintiffs.

Philip L. Willman and Anne Rapkin, Asst. Attys. Gen., Tyrone C. Fahner, Ill. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

KOCORAS, District Judge.

Plaintiff Paxton Landfill Corporation (Paxton), an Illinois corporation whose sole

business is the operation of a sanitary landfill site in Cook County, Illinois, was denied a permit to operate certain waste disposal trenches by the Illinois Environmental Protection Agency (Agency). The operating permit was denied on December 29, 1980, pursuant to Section 39(e)(i) of the Illinois Environmental Protection Act (Act), *Ill. Rev.Stat.* chp. 111½, sec. 1039(e)(i). Section 39(e)(i) became effective on September 18, 1980, three weeks after the Agency had granted Paxton a permit to construct and develop the trenches. Paxton spent approximately $97,000 developing the trenches.

The Agency specified nine instances of alleged misconduct by plaintiff Steve Martell as the basis for the denial.[1] The operating permit was denied without prior notice or opportunity for plaintiffs to be heard or answer or contest the basis for the denial. Absent an operating permit, waste disposal is prohibited. Thus, the denial effectively forced Paxton to cease all operations.

Plaintiffs filed a complaint seeking declaratory relief pursuant to 28 U.S.C. § 2201, § 2202, and Fed.R.Civ.Pro. 57, and injunctive relief pursuant to 42 U.S.C. § 1983 and the fourteenth amendment to the United States Constitution, claiming that, in the circumstances of this case, the lack of a pre-denial hearing deprived them of protected property and liberty interests without due process of law. They subsequently moved for a preliminary injunction enjoining defendants from applying Section 39(e)(i) of the Act to deny the operating permit, and ordering defendants to issue the permit, pending a plenary hearing before the Agency on the charges which formed the basis for the denial.

The parties submitted extensive memoranda, affidavits, and exhibits. Following two days of evidentiary hearings on the merits of plaintiffs' motion, proposed findings of fact and conclusions of law were proffered. Upon careful consideration of the evidence adduced at the hearing, and the materials submitted by the parties, plaintiffs' motion for a preliminary injunction is granted.

*Findings of Fact and Conclusions of Law*

### I

Under the Act, the Agency and the Illinois Pollution Control Board (Board) are granted broad authority over Illinois environmental matters, including the regulation of sanitary landfills.[2] In addition, the Board is empowered to adopt rules and regulations to implement environmental control standards which are consistent with the goals of the Act.[3]

In accordance with its authority under the Act, the Board adopted the Solid Waste Rules and Regulations[4] (Solid Waste Rules) to govern solid waste management sites. Rule 201 requires a development permit to be issued before a new solid waste management site may be developed or an existing one modified. Rule 202(b)(i) requires an operating permit from the Agency before the use or operation of an existing solid waste management site. Under Rule 206(a), the Agency may impose conditions on issued permits.[5] The standards for issuance of permits are contained in Rule 207, which provides, in relevant part, that permits shall not be granted unless the Agency receives adequate proof that the waste site will be developed, modified, or operated properly under the Act and the Rules, and that operating permits conform to all conditions required by the corresponding development permits. Although the term "adequate proof" is not defined in the Act or the Rules, Rule 316(a) provides that an application for a development permit must contain

---

1. Martell is the sole shareholder of plaintiff Stryker International Inc., and a director and chief officer of Paxton and Stryker. Paxton is wholly owned by Stryker, and is operated by Stryker as its only business.

2. See Ill.Rev.Stats. chp. 111½, secs. 1004 and 1005.

3. Ill.Rev.Stat. chp. 111½, sec. 1005(b).

4. Illinois Pollution Control Board Rules and Regulations, Chapter 7: Solid Waste (1973).

5. See also Section 39(a), Ill.Rev.Stat. chp. 111½, sec. 1039(a).

evidence adequate to prove to the Agency that the development of the landfill will not cause or tend to cause water or air pollution, will not violate applicable air and water quality standards, and will not violate any Board rule or regulation. In addition, the development application must include, among other things, plans, maps, geographical data, soil and water analyses, and a description of the proposed methods of operation.

Rule 316(b)(i) also requires that operating permit applicants prove to the Agency that the operation of the landfill will not violate the Act or Board regulations. Moreover, the operating application must include a certification [6] that all data and information previously required by Rule 316(a) has been provided to the Agency and that all conditions have been complied with, except that information already submitted may be incorporated by reference into the application and need not be resubmitted. Before an operating permit may be issued, the Agency is required by Rule 316(b)(2) to inspect the developed site and determine that it accords with the provisions of the development permit application, the Act, and all applicable regulations.

Section 5(d) of the Act [7] also empowers the Board to conduct hearings on alleged violations of the Act or regulations. Section 30 [8] provides that the Agency shall investigate alleged violations of the Act, its rules, regulations, and permits, upon request of the Board. Under Section 31(a),[9] if the investigation reveals a possible violation, a written notice and formal complaint specifying the particular provision allegedly violated must be served; the alleged violator must answer the charges at a hearing before the Board within 21 days of the notice. Section 31(c) provides that the Agency has the burden of proof in the hearing to demonstrate that the respondent has caused or threatened to cause air or water pollution, or has violated or threatens to violate the Act, its rules or regulations, or a permit provision. Section 32 [10] prescribes a full trial-type evidentiary hearing on the purported violation before a qualified hearing officer,[11] and section 33(a) [12] requires the Board to publish written factual findings following the hearing.

Section 39(a) [13] of the Act provides that application must be made to the Agency when the Board's regulations require a permit for the development, construction, modification, or operation of a waste facility. The Agency must issue such a permit upon proof by the applicant that the facility will not violate the Act or regulations. If a permit is denied, the applicant must receive detailed statements as to the reasons for the denial, including the specific type of information, if any, which the Agency deems the applicant did not provide, and which sections of the Act and regulations would be potentially unmet or violated if the permit were granted. There are no provisions in either the Act or the Rules for any type of temporary or restricted operating permits pending an appeal from a permit denial.

Pursuant to Sections 40(a) [14] and 5(d),[15] appeal of a permit denial may be made to the Board. The hearing procedure is the same as that employed regarding an alleged violation, with one important exception: the applicant-petitioner has the burden of proof before the Board concerning the propriety of the denial. Although Section

---

6. Rule 205(d) requires all permit applications to be signed by the owner and operator of the site, and to be certified as to all engineering features by a professional engineer.

7. Ill.Rev.Stat. chp. 111½, sec. 1005(d).

8. Ill.Rev.Stat. chp. 111½, sec. 1030.

9. Ill.Rev.Stat. chp. 111½, sec. 1031(a).

10. Ill.Rev.Stat. chp. 111½, sec. 1032.

11. Section 5(a), Ill.Rev.Stat. chp. 111½, sec. 1005(a), provides that hearing officers shall be attorneys licensed to practice in Illinois.

12. Ill.Rev.Stat. chp. 111½, sec. 1033(a).

13. Ill.Rev.Stat. chp. 111½, sec. 1039(a).

14. Ill.Rev.Stat. chp. 111½, sec. 1040(a).

15. Ill.Rev.Stat. chp. 111½, sec. 1005(d).

40(a) does not specify a time during which the hearing must be held or a decision rendered, the petitioner may deem the permit issued if there is no final action by the Board within 90 days. This time period, however, may be extended an additional 30 days, to a maximum of 120 days, if the Board membership falls below a quorum.[16]

On September 18, 1980, an amendment to Section 39 of the Act took effect. The amendment, Section 39(e),[17] provides:

(e) Before issuing any permit for the conduct of any refuse-collection or refuse-disposal operation, the Agency shall conduct an evaluation of the prospective operator's prior experience in waste management operations. The Agency may deny such a permit if the prospective operator or any employee or officer of the prospective operator has a history of:

(i) repeated violations of federal, State, or local laws, regulations, standards, or ordinances in the operation of refuse disposal facilities or sites; or

(ii) conviction in this or another State of any crime which is a felony under the laws of this State or conviction of a felony in a federal court; or

(iii) proof of gross carelessness or incompetence in handling, storing, processing, transporting or disposal of any hazardous waste.

The Agency relied on Section 39(e)(i) in denying the operating permit requested by Paxton. Prior to this amendment, under both the Rules and Agency practice an operating permit would automatically issue for the same site given a development permit upon receipt by the Agency of a proper certification pursuant to Rule 205(d)[18] and confirmation of the proper nature of the certification by the Agency inspection required by Rule 316(b)(2). The Agency concedes that until Section 39(e)(i) became effective, it could not refuse to issue an oper-

ating permit based on alleged prior violations of federal, State, or local laws, regulations, standards, or ordinances in the operation of waste disposal sites. As prescribed by Rule 316(b)(1), an operating permit application need not contain information already submitted to the Agency in the development permit application regarding evidence adequate to prove that the operation of the landfill site would not violate the Act or regulations. Instead, the Rule allows this information to be incorporated by reference. Since all information required for the operating permit (other than the engineers certification and the Agency inspection) is submitted with the development permit application, the issuance of a development permit by the Agency was tantamount to the issuance of an operating permit prior to the enactment of Section 39(e).

## II

Paxton has been operating its sanitary landfill site since approximately 1971. On August 30, 1979, plaintiff Stryker International Inc. (Stryker), through its sole shareholder and chief operating officer, Steve Martell, purchased Paxton; Stryker's sole business is the operation of Paxton.[19] From the time of the purchase until November 18, 1980, Paxton disposed of such refuse as garbage, demolition wastes, and liquid, semi-liquid, and solid hazardous and nonhazardous wastes in trenches constructed and sealed so as to contain the wastes and prevent contamination of ground and subsurface waters. The disposal of hazardous waste materials was discontinued after November 18, 1980. Paxton ceased virtually all operations after the denial of the operating permit on December 29, 1980.

During the time it operated the landfill site, Paxton applied for and received several development, operating, and supplemen-

16. Section 5(a) of the Act, Ill.Rev.Stat. chp. 111½, sec. 1005(a), provides that the Board shall consist of five members, three of whom shall constitute a quorum.

17. Ill.Rev.Stat. chp. 111½, sec. 1039(e) (1980).

18. See note 6, *supra*.

19. See note 1, *supra*.

tal [20] permits from the Agency. For several years before Stryker's purchase of Paxton, the Agency required Paxton to apply for permits on a trench-by-trench basis. At the time of the purchase, the site had only one partially filled operating trench, collectively designated as trenches A, A–1, and A–2.

In and about May, 1980, and prior to receipt of a development permit, Paxton began to develop additional trenches in an area of the landfill site known as Parcel III. These trenches were labeled trenches R, S, T, and X, Y, Z, and were developed based on the advice of James Douglas Andrews, an independent engineer retained to perform engineering, landfill planning, and waste management consulting duties for Paxton. It was Andrews' opinion that the Parcel III development was proper under previously issued permits.

Paxton began operations in trenches X and Y in May 1980. In August 1980, Paxton was visited by Mr. Kenneth P. Becheley, the regional manager of land pollution control field units for the Agency. Becheley informed Daniel Smith, the Paxton site operations manager, that the development and operation of these trenches was improper. Paxton accordingly applied for a supplemental permit to develop additional trenches, including trenches R, S, T, X, Y, Z, and U, V, W. This permit was granted by the Agency on August 27, 1980. Paxton subsequently applied for an operating permit for trenches R, S, T and Z, and this permit was granted by the Agency on October 3, 1980, two weeks after the effective date of Section 39(e) of the Act. Paxton spent approximately $100,000 developing trenches R, S, T and Z. Even though the Agency had the same information later used to deny an operating permit for trenches U, V and W, the operating permit was issued unaccompanied by allegations of prior improper conduct.

On September 16, 1980, Paxton began development of trenches U, V, and W, pursuant to the permit issued on August 27. Development of these trenches was completed on November 15, 1980, at a cost of approximately $97,000. On November 17,

independent engineer Andrews certified trenches U, V, and W as being in compliance with the plans and specifications approved by the Agency in the August 27 development permit. Andrews had been employed previously by the Agency as both the manager of the Permit Section, Division of Land Pollution Control, and as the manager of the Division of Land Pollution Control. Following Andrews' certification, Paxton requested the Agency to issue an operating permit for trenches U, V, and W; the Agency received the certification and request on November 18. On December 12, Ms. Bonnie Eleder, a field inspector for the Agency, inspected the trenches pursuant to Agency procedure under Rule 316(b)(2). She reported her findings to the Agency, concluded that the trenches conformed to the plans, specifications, and conditions of the development permit, and recommended that an operating permit issue. Sometime after Ms. Eleder's inspection but before December 29, Andrews was advised by Mr. Terry Ayers, an engineer employed by the Agency, that the Agency had found the construction of trenches U, V, and W to be proper, thereby meeting all statutory and regulatory criteria for the issuance of an operating permit. Anticipating the grant of the permit based on the August 27 development permit and the October 3 operating permit for trenches R, S, T, and Z, Paxton spent a substantial amount of money in November and December to purchase capital equipment for the landfill.

On December 29, 1980, the Agency denied Paxton an operating permit for trenches U, V, and W based on Section 39(e)(i) of the Act. At no time between the effective date of Section 39(e)(i) on September 18 and December 29 did the Agency advise Paxton that the permit might be denied on this basis. The denial letter, received by Paxton on January 2, 1981, stated that the operating permit was denied specifically because Steve Martell had a past history of repeated violations of federal, state, or local laws, regulations, standards, or ordinances in the operation of refuse disposal facilities or sites.

---

**20.** Rule 210 provides that development, operating, and experimental permits may be modified by a supplemental permit issued by the Agency.

The denial letter complied with the specific notice requirements of Section 39(a) by listing nine instances of alleged violations. However, none of the asserted violations concerned an adjudication reached after an evidentiary hearing, several did not name or involve Martell, and two involved lawsuits that were settled between the parties without any admissions of wrongdoing. The nine instances of alleged violations were:

1.  Item 1 referred to a lawsuit entitled *People of the State of Illinois v. Steve Martell and U.S. Drum Corporation*, 79–CH–1915, and to an agreed Final Order entered on May 9, 1979. Although neither the complaint nor Final Order were attached to the dismissal letter, the evidence at the hearing demonstrated that this lawsuit charged Martell with operating the U.S. Drum waste management site without a permit, and that Martell and U.S. Drum were ordered to clean up the site. The parties stipulated that the site was intended to operate as a bulking and transfer facility, not as a long term disposal site. This suit was settled without a trial or evidentiary hearing.

2.  Item 2 referred to a December 26, 1979 letter from Ms. Laurie Breitkopf, an attorney in the Agency's Enforcement Division of Land Pollution Control, to Jack Sauer and Douglas Andrews. Paragraph 1 of the letter demanded that alleged "problems" with the "cover" on waste at the Paxton site be corrected, and advised that additional development and operating permits must be obtained before further expansion. There was no enforcement action threatened regarding Paxton, and none was ever taken.

    Paragraph 2 dealt with alleged non-compliance by U.S. Drum Corporation with the terms of the Order referred to in item 1. The letter advised Sauer and Andrews that the Agency expected immediate compliance with the terms of the Order, and threatened a contempt action in the event of continued non-compliance. No such action was ever taken by the Agency.

    Paragraph 3 and 4 advised that state permits were necessary before development or operation of other disposal sites. There were no allegations of impropriety regarding these sites, and no enforcement actions were commenced by the Agency.

3.  Item 3 also related to the lawsuit mentioned in item 1, and referred to Agency inspection reports regarding the operation of the U.S. Drum site. None of the alleged violations cited in the reports resulted in enforcement actions by the Agency.

4.  Item 4 referred to photographs of the U.S. Drum site mentioned as the subject of the item 1 lawsuit. These photographs, however, were taken in April 1979, one month before the final Order regarding a clean-up of the site was entered in the lawsuit. These photographs did not result in an enforcement action by the Agency.

5.  Item 5 also related to the U.S. Drum disposal site and referred to certain letters sent by the Agency to third parties requesting that waste no longer be transported to the site. No enforcement action was threatened or taken against U.S. Drum Corporation concerning these letters.

6.  Item 6 referred to alleged illegal activities of U.S. Scrap Corporation, an entity controlled by Martell, which resulted in a lawsuit in Cook County Circuit Court, *Metropolitan Sanitary District of Greater Chicago v. U.S. Scrap Corporation*, 74–CH–6160. Martell was not named as a party defendant in either the complaint or the amended complaint. This suit was settled between the parties without an evidentiary hearing, and the Order issued states that the settlement was not based on any admission of U.S. Scrap. Although this Order was mentioned in item 6, it was not attached to the denial letter.

7. Item 7 referred to a lawsuit filed by the United States Environmental Protection Agency in the Federal District Court for the Northern District of Indiana, *United States v. Martell, et al.*, H–80–473. Mr. William Seltzer, the senior attorney in the Agency's enforcement section and under whose direction the denial letter was prepared testified that he was completely unfamiliar with the current posture of this case. In fact, Martell has not yet answered the complaint and there has been no evidentiary hearing on the merits.

8. Item 8 referred to charges pending before the Board concerning alleged violations at the Paxton site before 1977, several years before Martell's relationship with Paxton. There has never been a hearing on the merits of these charges and they are still apparently unresolved.

9. Item 9 referred to a *quo warranto* action filed by the Illinois Attorney General in the Circuit Court of Cook County, Illinois, No. 80–L–16170. This action is still pending, without an evidentiary hearing having been conducted.

In short, none of the listed instances involved either a determination of wrongdoing by Martell reached after an evidentiary hearing or an admission of wrongdoing. Moreover, several of the alleged violations relied on for denial never resulted in enforcement actions being brought before the Board by the Agency.

Eugene P. Theois, the manager of the Solid Waste Unit for the Agency, acknowledged that the nine enumerated instances were the sole reasons for the denial. The denial letter did not allege any new violations by Martell between the issuance of the August 27 development permit and the denial of the operating permit for trenches U, V, and W on December 29. Theois stated that the Agency knew of all purported violations both on August 27, and at the time Paxton received the October 3 operating permit for trenches R, S, T, and Z. Theois did not, however, explain the Agency's inconsistency in issuing the October 3 operating permit and denying the operating permit for trenches U, V, and W when the criteria considered by the Agency was identical for both permits. By issuing an operating permit after the September 18, 1980 amendments to Section 39, the Agency clearly encouraged Paxton to continue with the development of trenches U, V, and W in the reasonable expectation that an operating permit would issue for those trenches.

In addition, Agency attorney Seltzer testified that it was the Agency's position on December 29, 1980 that any single one of the purported violations by Martell constituted a sufficient basis for denial of the operating permit pursuant to Section 39(e)(i). Thus, under the Agency's reasoning, the charges referred to in item 8 of the denial letter regarding alleged pre-1977 violations at the Paxton site were alone sufficient to deny the operating permit for the trenches. However, Martell was not related to Paxton in any way before August 30, 1979, and obviously had no involvement with the violations alleged in item 8. Accordingly, the Agency's denial on this basis was manifestly improper.

As a result of the denial of the operating permit, Paxton has been forced to virtually close its doors. Because all of its previously permitted trenches have been filled, Paxton is no longer able to perform on existing agreements with its customers. Consequently, its income has ceased and it is in imminent danger of bankruptcy.[21]

---

21. Paxton is the sole income-generating asset of Stryker, and all Paxton income is ultimately received by Stryker; thus, Stryker, too, is in dire financial condition. As of January 15, 1981, Stryker had a total of approximately $207,640.42 available for operations. This amount consisted of cash reserves of $106,-989.85 and estimated accounts receivable to be collected by February 28, 1981 of $100,650.57. January and February operating expenses and debt servicing amounted to $163,821.00, leaving an estimated cash balance of $43,819.42 as of February 28, 1981. In addition, Paxton and Stryker have outstanding accounts and notes payable in the amount of approximately $860,-000.00 which are subject to acceleration.

## III

Plaintiffs contend that when the Agency relies on unadjudicated charges in denying a permit under Section 39(e)(i), due process requires a pre-denial hearing to afford plaintiffs an opportunity to contest the alleged violations which underlie the unadjudicated charges. Plaintiffs also assert that the post-denial appeal and review procedures provided by the Act are constitutionally inadequate in this case. Before addressing the merits of these claims, a brief consideration of whether plaintiffs should have exhausted their state court remedies before applying to this Court for vindication of their constitutional claims, and whether this Court should abstain from decision in order to obviate the necessity for a ruling on the constitutional issues presented, is in order.

■ It has long been settled that a plaintiff asserting violations of his constitutional rights under the fourteenth amendment need not exhaust state court remedies before seeking redress in a federal district court. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Damico v. California*, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); *Carter v. Stanton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972). For example, in *Brooks v. Center Township*, 485 F.2d 383 (7th Cir. 1973), the Seventh Circuit held that exhaustion of state post-denial administrative remedies was not required before plaintiffs could challenge the termination of rent and food assistance benefits in a federal court. Similarly, in *Freitag v. Carter*, 489 F.2d 1377 (7th Cir. 1973), the court refused to require exhaustion of Illinois' mandamus procedure before application to the federal court for relief by a plaintiff who had been denied a chauffeur's license without a hearing. Finally, in *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), the Supreme Court ruled that a horse trainer whose license was suspended without a prompt post-suspension hearing was denied due process. The Court considered whether the statutory

post-suspension hearing procedure had to be exhausted before a federal suit could properly be filed, and stated:

> Under existing authority, exhaustion of administrative remedies is not required when "the question of the adequacy of the administrative remedy ... [is] for all practical purposes identical with the merits of [the plaintiff's] lawsuit." *Gibson v. Berryhill*, 411 U.S. 564, 575, 93 S.Ct. 1689, 1696, 36 L.Ed.2d 488 (1973).

443 U.S. at 63, n.10, 99 S.Ct. at 2648, n.10. Accordingly, it was unnecessary for plaintiffs to exhaust their available state remedies before commencing this action.

■ Nor should this court abstain from resolving the constitutional claims presented. When a state statute is alleged to be unconstitutional, and a state tribunal may interpret or construe that statute in a manner which would obviate the constitutional question, abstention is proper. *Zwickler v. Koota*, 389 U.S. 241, 251, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967). However, plaintiffs do not contest the constitutionality of Section 39(e)(i), and there is therefore no question of a construction that would avoid or modify the constitutional issues.

Moreover, this case does not present an unclear state law issue, for, as the prior discussion of the Act reveals, the construction and meaning of the statute is certain. In addition, if this action were first brought in a state court, the issues would be the same. These are federal claims which do not depend on any question of state law, and it is the function of federal courts to adjudicate federal rights. Abstention is not required merely because other forums may also consider and uphold such rights. As the Supreme Court has emphasized, abstention cannot be ordered simply to give state courts the first opportunity to vindicate a federal claim. In *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1443, 10 L.Ed.2d 622 (1962), after examining the purposes of the Civil Rights Act, the court concluded that "[w]e would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a

state court." 373 U.S. at 672, 83 S.Ct. at 1436. The Seventh Circuit has similarly recognized that "[w]here, as here, no such substantial question as to the applicable state law can be identified, abstention is equivalent to an impermissible requirement of exhaustion of state remedies." *Indiana State Employees Ass'n, Inc. v. Boehning*, 511 F.2d 834, 836–37 (7th Cir. 1975). On this basis, abstention is unwarranted.

### IV

Whether a preliminary injunction should be granted or denied requires a consideration of four major factors: (1) a significant threat of irreparable harm to the plaintiff; (2) the probability that plaintiff will ultimately succeed on the merits; (3) a balancing of the injury to plaintiff against the harm or inconvenience likely to be suffered by the defendant; and (4) the public interest. *Ekanem v. Health & Hospital Corporation of Marion County*, 589 F.2d 316, 319 (7th Cir. 1978); Wright & Miller, Federal Practice and Procedure, Civil § 2948 (1973). Weighing these factors in this case, this Court finds that a preliminary injunction should issue.

### *Probability of Success On the Merits*

Plaintiffs have demonstrated a strong likelihood that they will prevail on the merits of their complaint. They argue that the denial of the operating permit deprived them of property interests protected by the fourteenth amendment on two grounds. First, they assert that they have a legitimate claim of entitlement to the operating permit based on existing rules and mutually explicit understandings. Second, plaintiffs maintain that the denial deprived them of their possessory interest in the Paxton site in that the only possible use of the land has been curtailed by the Agency's action. Moreover, plaintiffs contend that they have been deprived of protected liberty interests by the Agency's public charges of illegal conduct by plaintiff Martell. They claim these charges have seriously damaged Martell's reputation and that Martell has been effectively precluded from engaging in his

sole business or occupation, waste management.

■ Procedural due process requirements apply where governmental decisions infringe individual property or liberty interests protected by the fourteenth amendment. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). A property interest in a benefit must depend on more than a unilateral expectation, abstract need, or mere desire. Rather, a person must have a legitimate claim of entitlement to a specific benefit before the fourteenth amendment's procedural protections apply. *Board of Regents v. Roth*, 408 U.S. 564, 557, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). For example, in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court held that a welfare recipient had a protected property interest in the continued receipt of welfare benefits under statutory and administrative standards defining eligibility for the benefits. Similarly, in *Slochower v. Board of Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956), the Court held that a public college professor dismissed from an office held under tenure provisions had an interest in continued employment protected by procedural due process.

■ In this case, plaintiffs have a legitimate claim of entitlement to the operating permit for trenches U, V, and W created and defined by existing rules and mutually explicit understandings. This situation is similar to that in *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), where the defendant had, without a hearing, refused to renew the plaintiff's expired one-year college teaching contract, thereby refusing to grant plaintiff a new benefit identical to the expired one. The Supreme Court held that despite the lack of a formal tenure policy, the plaintiff was entitled to prove the existence of a protected property interest in his employment stemming from official policy statements and guidelines which implied some form of tenure. "Proof of such a property interest would not, of course, entitle him to reinstatement. But such proof would obligate

college officials to grant a hearing at his request, where he could be informed of the grounds for his non-retention and challenge their sufficiency." 408 U.S. at 603, 92 S.Ct. at 2700.

Here, as in *Perry*, the operating permit application technically sought a "new" benefit to supersede the "expiring" benefit of the development permit. Defendants accordingly maintain plaintiffs have not shown an entitlement to the operating permit, and therefore do not have a protected property interest. However, here, as in *Perry*,

> "property" interests subject to due process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings"... A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

408 U.S. at 601, 92 S.Ct. at 2699. In this case, as previously described, once a development permit had been issued and the required certification and inspection conducted, an operating permit would issue automatically. In reliance on the development permit issued for trenches R, S, T, U, V, and W on August 27, 1980, Paxton spent substantial sums of money in the legitimate expectation that operating permits would be forthcoming. Indeed, such a permit did issue for trenches R, S, T, and Z on October 3, 1980, despite the fact that Martell's alleged operating history was by then a proper target of Agency scrutiny. Clearly, the issuance of this permit could only have bolstered plaintiffs' legitimate expectations that an operating permit would be granted for trenches U, V, and W. Once these trenches were developed, plaintiffs complied with Rules 205(d) and 316(b)(2) by having engineer Andrews certify the trenches and Agency inspector Eleder inspect and approve them. By thus complying with all statutory and regulatory standards for the development and operating

permit, plaintiffs established a legitimate claim of entitlement to the operating permit. They could only be deprived of this property interest by due process of law.

Furthermore, since plaintiffs cannot lawfully operate the Paxton site without development and operating permits, their entire livelihood depends on obtaining and keeping such permits. Having obtained numerous permits over the years, including the development permit for trenches U, V, and W, plaintiffs are, in effect, licensees who depend on their licenses for their livelihood. Denial by the Agency of an operating permit to which plaintiffs have a legitimate claim of entitlement is therefore analogous to the suspension of a license "essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of licensees. In such cases the licenses are not to be taken away without the procedural due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971).

Plaintiffs also have a possessory property interest in the Paxton site real estate which is sufficient to invoke the protections of procedural due process, since the Agency's action prevents plaintiffs from using the land in the only manner in which it has been used since at least 1971. *See, e. g., Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). Furthermore, Section 22.3 of the Act makes the owner and operator of a site responsible for the site for 20 years, or such longer period of time as is required by the federal Resource Conservation and Recovery Act of 1976. The site must be monitored for gas migration, drainage problems, erosion, settling, ground and surface water pollution, and any other environmental or safety problems, and the owner or operator must take whatever action is necessary to remedy such problems during the period of respon-

sibility. In light of this provision it is doubtful that plaintiffs can put the land to an alternative use. This nearly permanent curtailment of the future use of the land clearly entitles the plaintiffs to the protections of procedural due process.

■■■■ In addition, plaintiffs have a protected liberty interest which has been infringed by the Agency's action. Where a person's reputation and integrity are sullied by state allegations of impropriety, due process requires an opportunity to refute the charges. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Similarly, a hearing is required where state action imposes a stigma or other disability on a person which forecloses his economic opportunities. *Id.* In the instant case, the Agency's denial letter charged that plaintiff Martell was involved in illegal activities. This document is a public record, and these allegations will certainly impact Martell's reputation and standing in the community. Moreover, the denial of the operating permit effectively precludes Martell from engaging in his only business, and thus seriously impinges on his livelihood.[22]

The foregoing discussion demonstrates that constitutionally protected interests requiring some form of notice and opportunity to be heard are at stake in this case. The question now presented is: are plaintiffs entitled to a pre-denial hearing, or are the post-denial appeal and review procedures of Section 40(a) constitutionally adequate in the circumstances of this case? The precise parameters of the hearing required must be determined by an analysis of the governmental and private interests affected.

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest

through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Balancing these factors in this case, this court finds that the lack of a pre-denial hearing deprived plaintiffs of due process of law.

A.

■ The existence of plaintiffs' sole business is the private interest at stake, for *without* an operating permit plaintiffs will lose their business in short order. Plaintiffs have already lost income and profits which they may not recover. Even if plaintiffs were to eventually prevail at a hearing before the Board, it is doubtful that they could be made whole, since the loss of their customers and business could not be restored by favorable Board action. The potentially fatal injury is similar in nature to that of the welfare recipient in *Goldberg v. Kelly, supra*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), since deprivation of the operating permit "pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." 397 U.S. at 264, 90 S.Ct. at 1018 (emphasis in original). This potential deprivation must be given significant weight in assessing the validity of the post-denial review process.

The Supreme Court recognized in *Fusari v. Steinberg*, 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975), that "the possible length of wrongful deprivation of . . . benefits [also] is an important factor in assessing the impact of official action on the private interests." There is no dispute here that the post-denial review procedures

---

**22.** Martell's future inability to engage in the waste management business in Illinois is demonstrated by the fact that on January 30, 1981 the Agency denied Martell a permit to develop a bulk transfer site. The denial letter listed ten alleged violations of laws, ordinances, or rules as the basis for denial under Section 39(e)(i). Eight of these ten instances were identical to those contained in the denial letter of December 29, 1980 regarding trenches U, V, and W.

can extend up to 120 days. In light of plaintiffs' precarious financial condition and inability to engage in any other income-producing activity, this 120 day period imposes a severe hardship on plaintiffs. This is particularly true since there are no provisions in the Act for temporary permits.

This Court concludes that the private interests at stake would receive substantially more protection from a pre-denial hearing than is available from a post-denial hearing.

### B.

The risk of erroneous deprivation of the plaintiffs' interests under the existing procedure for denying a permit is also great in this case. The alleged violations which underlie the denial of the operating permit have never been adjudicated, and Martell has never been convicted of any wrongdoing. Indeed, there has never been an evidentiary hearing held regarding any of the purported violations, and Martell has never contested the allegations in any forum. The risk of an erroneous deprivation is starkly illustrated by the fact that one of the instances relied on by the Agency for denial occurred several years before Martell ever became associated with Paxton or the landfill site. Yet the Agency regards this charge as enough in and of itself to warrant denial. Under these circumstances, a pre-denial hearing would significantly reduce the risk that plaintiffs would be subjected to an erroneous deprivation by the Agency.

This situation stands in sharp contrast to that presented in *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977), which concerned the revocation, without a prior hearing, of a drivers license. The license was revoked pursuant to a statute which empowered the Illinois Secretary of State to suspend or revoke a license without a prior hearing where the licensee had been repeatedly convicted of traffic violations. In considering whether an evidentiary hearing was required prior to the revocation of the license, the Court held that the risk of erroneous deprivation in the absence of such a hearing was not great.

In this case appellee had the opportunity for a full judicial hearing in connection with each of the traffic convictions on which the Secretary's decision was based. Appellee has not challenged the validity of those convictions or the adequacy of his procedural rights at the time they were determined.

431 U.S. at 113, 97 S.Ct. at 1728, 52 L.Ed.2d 172. The Court also ruled that additional procedures would not reduce the number of erroneous deprivations or protect any additional substantive rights.

In contrast to *Dixon,* Section 39(e)(i) allows denials based on alleged violations, not convictions. Martell has not had a full judicial or any other kind of a hearing in connection with the putative violations and does challenge the validity of the allegations. Finally, a predecision hearing would serve to protect substantive rights in that plaintiffs would have the opportunity to contest the merits of the Agency's charges and argue that a permit should be granted. Thus, an alternative pre-decision hearing procedure would have significant value in reducing the risk of erroneous deprivation.

### C.

The final factor for consideration is the State's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge, supra,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The Agency plainly has a vital interest in ensuring the safe and proper operation of waste material facilities. Public health and safety concerns mandate the strict oversight of such facilities to guard against shoddy or dangerous conduct. Thus the Agency may properly require that disposal trenches meet technical criteria which minimize public risk. However, this interest is not well served by the Agency's action here, since it is undisputed that trenches U, V, and W conform to the Agency's own technical and engineering specifications. On several occasions Agency personnel confirmed that the trenches had been properly con-

structed and defendants have never suggested otherwise. It is unquestioned that Agency concerns about the future operation of the trenches are legitimate. These concerns, however, can be met by the standard Agency practice of regular inspection and monitoring. Should violative conduct be detected, the Agency has ample enforcement powers to deal with the situation.

The Agency also unquestionably has a legitimate interest in preventing persons with a prior history of violations from operating disposal sites. The means by which this may be accomplished are clearly set out in the Act. Sections 5(b), 30, 31, 32, and 33 confer broad investigatory and enforcement powers on the Board and the Agency, and Section 33(b) empowers the Board to punish violations of the Act by revoking permits. This existing scheme allows simple, fast, and efficient measures to be taken to preclude and punish violative conduct. Once such action has been taken, there is a clearly established and adjudicated basis for the denial of future permits as well. *See Dixon v. Love, supra,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977). However, this prophylactic interest is poorly served by the procedures employed by the Agency in this case, since those procedures permitted the Agency to deny a permit to a person who has never been found by any administrative or judicial body to have violated any legal standards regarding waste facilities.

Finally, the established predecision provisions of the Act compel the conclusion that additional fiscal and administrative burdens would be minimal if the Agency conducted a predenial hearing in cases of this nature. This is not a case where the imposition of a substitute predecision hearing procedure will generate an unwieldy and expensive number of requests for full administrative hearings. *Cf. Mathews v. Eldridge,* 24 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). While a situation factually similar to the instant case may conceivably reoccur, it is difficult to imagine that requiring a predecision hearing in cases where the Agency intends to rely on unadjudicated violations as the basis for a contemplated permit denial will impose a substantial administrative or fiscal burden on the Agency.

## D.

The post-denial review procedures set out in Section 40 of the Act are constitutionally inadequate in this case in that they fail to provide for a prompt post-denial hearing and disposition. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge, supra,* 424 U.S. 333, 96 S.Ct. at 902 (1976), *citing Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). If the plaintiffs had sought review under Section 40 after receiving the denial letter on January 2, 1981, the Board would not have been required to render a decision until four months later. By that time, plaintiffs would be bankrupt.

In *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), the license of a horse trainer was temporarily suspended, without a presuspension hearing, after the State had satisfactorily established probable cause to believe that a horse had been drugged and that the trainer had been at least negligent in failing to prevent the drugging. After ruling that the trainer was not entitled to a presuspension hearing, the Supreme Court held that the established post-suspension hearing procedures violated the trainer's right to due process. Those procedures did not specify a time for the post-suspension hearing, and granted the State commission up to thirty days following the hearing to decide the case. The Court stated:

> As the District Court found, the consequences to a trainer of even a temporary suspension can be severe; and we have held that the opportunity to be heard must be "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). Here, the provision for an administrative hearing, neither on its face nor as applied in this case, assured a prompt proceeding and prompt disposition of the outstanding issues between Barchi and the State. Indeed, in-

sofar as the statutory requirements are concerned, it is as likely as not that Barchi and others subject to relatively brief suspensions would have no opportunity to put the State to its proof until they have suffered the full penalty imposed. Yet, it is possible that Barchi's horse may not have been drugged and Barchi may not have been at fault at all. Once suspension has been imposed, the trainer's interest in a speedy resolution of controversy becomes paramount, it seems to us. We also discern little or no state interest, and the State has suggested none, in an appreciable delay in going forward with a full hearing. On the contrary, it would seem as much in the State's interest as Barchi's to have an early and reliable determination with respect to the integrity of those participating in state-supervised horse racing.

In these circumstances, it was necessary that Barchi be assured a prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay. Because the statute as applied in this case was deficient in this respect, Barchi's suspension was constitutionally infirm under the Due Process Clause of the Fourteenth Amendment.

443 U.S. at 66, 99 S.Ct. at 2650. The *Barry* rationale controls the instant case. Plaintiffs interest in the resolution of this controversy is paramount, and there is little or no state interest in an appreciable delay. The failure of Section 40 to assure a prompt postdenial hearing renders those procedures constitutionally infirm.

### Irreparable Harm

Plaintiffs have demonstrated that they will suffer irreparable harm for which they have no adequate remedy at law. They will certainly lose their present and future livelihood, and may well suffer injury to their reputation in the community if preliminary relief is not granted. In *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975), the Court recognized that injunctive relief is proper where there is a strong likelihood of significant and lasting injury to a corporate plaintiff's goodwill and business existence.

As required to support such relief, these respondents alleged (and petitioner did not deny) that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standard for granting interim relief, for otherwise favorable final judgment might well be useless.

*See also Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970).

Defendants' contention that plaintiffs caused or contributed to their present situation by poor planning, lack of foresight, and delay is meritless. On the contrary, the evidence reveals that shortly after Martell and Stryker took control of Paxton, plaintiffs retained James Andrews' engineering firm, Environmental Engineering, Inc., to plan the future development of the Paxton site. Moreover, plaintiffs spent substantial sums on earthmoving equipment after the Paxton purchase in August 1979. Finally, plaintiffs' efforts to procure development and operating permits were made in a timely and reasonable fashion. Accordingly, plaintiffs made every reasonable effort to properly plan the future operations of their business.

### Public Interest

Granting a preliminary injunction in this case will not harm the public interest in a clean and safe environment. Trenches U, V, and W have been developed in compliance with the plans and specifications approved by the Agency in the development permit, and the Agency approval of the technical aspects of the trench construction demonstrates that they are environmentally sound. Moreover, as noted above, the public interest in the safe operation of the trenches is protected by the Agency's broad monitoring and enforcement powers. Finally, the scope of the instant injunctive order precludes the plaintiffs from disposing of hazardous waste materials.

### Balance of Interests

■ The foregoing discussion demonstrates that the plaintiffs' injuries markedly

outweigh the potential harm or inconvenience likely to be suffered by the defendants in this case. For the reasons set forth, plaintiffs have satisfied the standards for injunctive relief.

Accordingly, defendants are enjoined from applying Section 39(e)(i) of the Act to deny plaintiffs an operating permit for trenches U, V, and W in the Paxton Landfill site, and are ordered to issue an operating permit for those trenches. The permit shall allow Paxton to dispose of non-hazardous waste materials in trenches U, V, and W until such time as the defendants have conducted a hearing before the Agency at which plaintiffs are afforded an opportunity to answer, contest, or rebut the allegations contained in the defendants' letter of December 29, 1980 which formed the basis for the denial of plaintiffs' operating permit application, pursuant to the provisions of the Illinois Administrative Procedure Act, Ill.Rev.Stat. ch. 127 § 1001 *et seq.* The issuance of the permit shall be conditioned upon the posting of a surety bond in the amount of $5,000.00 by the plaintiffs for the payment of any costs and damages which may be incurred by defendants as a result of wrongful enjoinment. Fed.R.Civ.Pro. 65(c).